IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARJORIE TRAMP, | ) | CASE NO.: 8:11-cv-00371 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ASSOCIATED UNDERWRITERS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

BRIEF OF PLAINTIFF, MARJORIE TRAMP, IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**PREPARED AND SUBMITTED BY**:

John P. Weis, #19618
Conor McCarthy, Senior Certified Law Clerk
SODORO, DALY, SHOMAKER & SELDE, PC, LLO
7000 Spring Street
Omaha, Nebraska 68106
Telephone: (402) 397-6200
Fax: (402) 397-6290
E-Mail: jweis@sodorolaw.com
ATTORNEY FOR PLAINTIFF

COMES NOW the Plaintiff, Marjorie Tramp, by and through counsel, and submits the following brief in opposition to Defendant's Motion for Summary Judgment:

## **INTRODUCTION**

Initially, the Plaintiff would inform this Court that Plaintiff's exhibits C-O, were all exhibits that were part of the Defendant's employee/bookkeeper, Julie Brudny's deposition transcript. For the Court's convenience, these exhibits were separated from Ms. Brudny's deposition transcript and filed as individual exhibits.

Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the non-movant." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) The Plaintiff shows this Court that there is more than sufficient evidence to support an inference that the Defendant engaged in conduct targeting the Plaintiff for dismissal based upon her age and health. The evidence supports the contention that the Defendant requested the Plaintiff not participate in the company health insurance plan because she was old enough to qualify for Medicare coverage. After the Plaintiff refused, the Defendant took actions to set the Plaintiff up for dismissal. The Defendant claims the Plaintiff was discharged as the result of a reduction in force and the Plaintiff had the weakest job performance. However, the Plaintiff contends there is ample evidence to support the reasonable inference that Defendant's claims in these regards were merely pretext in a thinly veiled attempt to provide legitimacy to the Defendant's otherwise discriminatory actions. Consequently, Defendant's Motion for Summary Judgment should be denied in its entirety.

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

1.     Plaintiff, Marjorie Tramp was hired by the Defendant, Associated Underwriters, Inc., in the year 2000 as a personal lines customer service representative.  (Complaint, ¶5)  She was licensed to sell insurance and her duties for Associated Underwriters, Inc. included training new personal lines employees on the requirements of the position.  (Tramp depo. 6:1-25)

2.     Before becoming the President of Associated Underwriters, Chris Hallgren was hired by Associated Underwriters to develop a life and health insurance division of the company. He was licensed to sell life and health insurance policies as well as annuities and IRA's. (Hallgren depo. 6:9-19)  Later, in August of 2007, Hallgren and Greg Gurbacki purchased Associated Underwriters and became President and Vice President respectively.   (Gurbacki depo. 4:20-5:3; 5:15-6:5)

3.     Despite Defendant's claim in its statement of facts that it was operating at a loss from the time of the purchase in August of 2007, Associated Underwriters purchased the Jones-Taylor Insurance Agency on December 17, 2007, for the purchase price of $507,500.00 with delivery of $307,500.00 at the time of closing and execution of a promissory note in the amount of $200,000.  Additionally, the parties agreed to pay John P. Jones a consulting fee of $1,000.00 per month for a period of 24 consecutive months.  (Pl. Ex. O, Stock Purchase Agreement)

4.     Four employees of the Jones-Taylor Insurance Agency were retained as employees of Associated Underwriters as of January 1, 2008:  Sandy Peer, Sue Stilmock, Bob Dunn, and Kelsey Hetrick.  (Gurbacki depo. 21:7-22:21)  These employees continued to operate out of the Jones-Taylor office, a separate location from the office of Associated Underwriters office, until January 1, 2009.  (Gurbacki depo. 23:15-24:13; Pl. Ex. A, Grasso depo. 11:8-20)

5.    In May of 2008, Associated Underwriters hired an additional employee, Tara Horn, to assist with duties in the Jones-Taylor office.  Ms. Horn was hired as a personal lines customer service representative.  She was not licensed at the time of her hiring but became licensed to sell insurance within two months of hiring.  (Pl. Ex. B, Brudny depo. 21:19-22:24) Prior to being hired by Associated Underwriters, Ms. Horn's work experience consisted of employment as a bank teller and a cocktail waitress.  (Pl. Ex. H, Horn Employee file)  In this same month, Stacy Bell was hired after having recently moved to Council Bluffs, Iowa, from Anita, Iowa.  (Pl. Ex. I, Bell Employee file)

6.    On June 2, 2008, Dan Grasso was hired by Associated Underwriters.  He was initially hired as a liaison between the offices of Associated Underwriters and Jones-Taylor.  At the time of his hiring he was not licensed to sell insurance but did obtain his license at a later date.  (Pl. Ex. A, Grasso depo. 8:7-16; Pl. Ex. J, Grasso Employee file)

7.    In June of 2008, Chris Hallgren contacted representatives of Coventry Health Care to obtain a quote for premium costs for a group health insurance policy for Associated Underwriters employees.  (Pl. Ex. P, AU-Coventry E-mails)  After back and forth discussion between the respective representatives, and in an attempt to obtain the best premium pricing, on July 28, 2008, Greg Gurbacki wrote to Coventry Health Care:  "We have lost several of the older, sicker employees and should have some consideration on this.  If you have provided us with your final rates then that is what we will use in our decision."  (Pl. Ex. P, AU-Coventry E-mails)  Associated Underwriters ultimately purchased a group health insurance plan from Coventry Health Care for a one year term from August 1, 2008, to August 1, 2009.  (Pl. Ex. B, Brudny depo. 26:5-21)

3

8.      In August of 2008, Chris Hallgren met with Marjorie Tramp, age 70, and Barb Treadway, age 71, and requested they voluntarily withdraw from coverage under the company's health insurance policy and apply for Medicare/Medicaid health insurance coverage.  Chris Hallgren was aware that both ladies would qualify for Medicare/Medicaid coverage due to their age.  During this meeting, Chris Hallgren did ***not*** offer that Associated Underwriters would pay for the costs of supplemental coverage to their Medicare/Medicaid coverage if necessary.  Chris Hallgren gave the ladies one day to make their decision whether to stay on Associated Underwriters' health insurance policy (for which they were already enrolled) or to withdraw their enrollment and apply for Medicare/Medicaid coverage.  The next day, Marjorie Tramp informed Chris Hallgren that she would not withdraw from Associated Underwriters' health insurance policy.  Chris Hallgren expressed his "disappointment" with Marjorie Tramp's decision, accusing her of being selfish in contributing to the increased cost of younger employee's health insurance-related costs. (Tramp depo. 19:5-21:20; 22:3-24; Complaint ¶6)

9.      On October 9, 2008, Marjorie Tramp was given a written reprimand and placed on 90 days probationary status. (Pl. Ex. C, Tramp Employee file)  Greg Gurbacki directed Dan Grasso, who had been promoted to be Marjorie Tramp's supervisor, to prepare the written reprimand and place Marjorie Tramp on probationary status.  (Pl. Ex. A, Grasso depo. 26:24-27:17; 77:18-78:10)  Grasso would not have given Marjorie Tramp a written reprimand were it not for the direction of Greg Gurbacki.  (Pl. Ex. A, Grasso depo. 34:22-25)  Of the three incidents listed in the written reprimand, the first outlined an incident that management was aware of in June of 2008.  No action had been taken on the incident until it was included in the written reprimand in October of 2008.  It should be pointed out the incident occurred before Dan Grasso was even employed by Associated Underwriters. (Pl. Ex. A, Grasso depo. 53:8-54:20)

10.     From October of 2008 through February of 2009, Grasso did not prepare a written reprimand for any other employee of Associated Underwriters.  For the same time period, Grasso did not give any verbal reprimands to any other employee of Associated Underwriters.  (Pl. Ex. A, Grasso depo. 28:5-14)   From the time Hallgren and Gurbacki purchased Associated Underwriters in 2007 through October of 2010, no other employee of Associated Underwriters was placed on probationary status.  (Gurbacki depo. 93:7-15)  After Marjorie Tramp was given the written reprimand and placed on probation, she was not provided with a work improvement plan or provided any information on what she needed to do to improve her work performance. (Gurbacki depo. 92:15-20)

11.     Associated Underwriters enacted an updated employee handbook in April of 2008.  The employee handbook does not provide any notice to employees that placing an employee on probationary status is a possible form of discipline.  (Pl. Ex. Q, Employee Handbook)

12.     Beginning approximately January 1, 2009, the Jones-Taylor office was closed and employees from the Jones-Taylor office (Sandy Peer, Sue Stilmock, Bob Dunn, Kelsey Hetrick, and Tara Horn, began working in the Associated Underwriters office.  On January 28, 2009, Marjorie Tramp requested Dan Grasso take her off probationary status.  Because Marjorie Tramp had corrected her deficiencies, and having met Grasso's expectations during the probationary period, the next day, Grasso complied and removed her probationary status.  (Pl. Ex. A, Grasso depo. 51:1-52:14)

13.     Prior to her termination, Marjorie Tramp informed Julie Brudny that she was scheduled to undergo arthroscopic knee surgery on February 4, 2009, and that she would be out

of the office for three days and return to work the following Monday.  Barb Treadway was also scheduled to undergo surgery during the month of February 2009.  (Tramp depo. 30:6-33:5)

14.     On February 3, 2009, Marjorie Tramp and Barb Treadway's employment with Associated Underwriters was terminated.  Associated Underwriters has maintained that the terminations were part of a reduction in force due to economic losses and Marjorie Tramp was discharged because she was the poorest performer in the personal lines division of the company. (Gurbacki depo. 77:17-22)

15.     No performance evaluations were conducted on *any* employee of Associated Underwriters from September of 2007 through November of 2009.  (Pl. Ex. B, Brudny depo. 47:14-24) (Gurbacki depo. 91:18-25; Pl, Ex. C-N)  No performance evaluations were conducted on any employee of the Jones-Taylor Insurance Agency.  (Pl. Ex. A, Grasso depo. 16:24-17:3)

16.     Marjorie Tramp's duties were assimilated by Sandy Peer, Sue Stilmock, Kelsey Hetrick, and Tara Horn, the employees that had come over from the closed Jones-Taylor office. (Pl. Ex. A, Grasso depo. 33:2-19)  All of these employees were younger than Marjorie Tramp. (Pl. Ex. A, Grasso depo. 33:20-23)  None of these employees elected to participate in Associated Underwriters group health insurance coverage.  (Pl. Ex. B, Brudny depo. 31:24-32:9; Pl Ex. E-H)

17.     Kelsey Hetrick assumed the duties of receptionist once she began working at the Associated Underwriters office and never obtained a license to sell insurance.  (Pl. Ex. B, Brudny depo. 20:21-21:4; Pl. Ex. G, Hetrick Employee file)  At the time Marjorie Tramp was fired, Tara Horn was approximately 8 months removed from having been employed as a bank teller with no prior insurance experience.  (Pl. Ex. B, Brudny depo. 21:5-13; Pl. Ex. H, Horn Employee file)  In fact, until January of 2009, Sandy Peer, Sue Stilmock, Kelsey Hetrick, and Tara Horn, only had experience dealing with clients of the Jones-Taylor Insurance Agency and

the procedures for dealing with those clients.  During the approximate one year period the Jones-Taylor office remained open, the former Jones-Taylor employees were not involved in the day to day operations conducted at the office of Associated Underwriters.  (Pl. Ex. A, Grasso depo. 73:10-74:8)

18.    In June of 2009, after the termination of Marjorie Tramp and Barb Treadway, Associated Underwriters again contacted representatives of Coventry Health Care to attempt to obtain better premium pricing for the company health insurance coverage.  Using very similar language to that used in the 2008 correspondence, Greg Gurbacki against believes the company is entitled to better pricing for reducing the old and sick employees from the coverage group.

> Since last year we have lost our oldest and sickest employees, Jim & Shari Devine are no longer here, Barb Treadway and Marjorie are no longer here.  Please let me know if this is the best we can do, what choices we have with you as I know that Chris and Jeff Mann would like to stay with you but we were expecting a rate decrease from the group becoming younger and healthier not an increase.

(Pl. Ex. P, AU-Coventry E-mails)

19.    Contrary to the assertions made by the Defendant in paragraph 38 of its Statement of Facts, the Defendant did benefit financially from the elimination of Marjorie Tramp and Barb Treadway from the group coverage.  Monthly premium payments for health insurance coverage prior to Hallgren and Gurbacki purchasing the company were approximately $13,000 per month.  From November of 2008 through January 2009, Julie Brudny, Associated Underwriters bookkeeper, testified in her deposition that the company monthly health insurance premium payments decreased to $9,000 per month.  She further testified that from February 2009 (the month Marjorie Tramp's employment was terminated) through July of 2009, the company monthly health insurance premium payments decreased to $5,000 per month.  (Pl. Ex. B, Brudny depo. 36:17-37:19)

7

20.    Also contrary to the assertions made by the Defendant in paragraph 38 of its Statement of Facts, Ms. Brudny testified that none of the employees whose employment was terminated in 2009 elected continue COBRA benefits.  (Pl. Ex. B, Brudny depo. 31:3-8)

## ARGUMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317.  The party seeking summary judgment always has the initial burden of presenting the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions which demonstrate the absence of a material fact. *Id.* This evidence must be viewed in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c).

However, special care must be given to summary judgment motions in employment discrimination cases.  As the Honorable Mark W. Bennett explained in *Bauer v. Metz Baking Co.,* 59 F. Supp. 2d 896, 900-901 (N.D. Iowa 1999), the court has often stated that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991); *Hillebrand v. M-Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir. 1987), *cert. denied,* 488 U.S. 1004, 109 S. Ct. 782, 102 L. Ed. 2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1204 (8th Cir. 1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford* ); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir. 1997).  Judge Bennett further explained, "To put it another way, because discrimination cases often depend on inferences rather than on  direct evidence,

8

summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford,* [37 F.3d at 1341]); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir. 1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir. 1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

A.     **Plaintiff has established sufficient proof of a prima facie case of age discrimination.**

It is the job of the finder of fact to interpret those facts in dispute. Where, because of conflicting testimony, or where facts being undisputed, fair-minded men might honestly draw differing conclusions, a fact question for the trier of fact is presented. *Hampton v Des Moines,* 65 F.2d 899, 902 (1933). In support of its motion for summary judgment, the Defendant has argued specific conclusions from certain facts. However, the standard for summary judgment is not based upon the Defendant's conclusions but, rather, could the trier of fact reach a different conclusion thereby creating a genuine issue of material fact. The trier of fact is required to make an ultimate determination of this issue, therefore summary judgment would be premature in light of the differing inferences that can be drawn from facts and evidence in this case.

Contrary to the Defendant's assertion, direct proof of age discrimination is not a requirement as direct evidence of any discrimination is largely considered a thing of the past. Susan Sturm, *Second Generation Employment Discrimination: A Structural Approach,* 101 COLUM. L. Rev. 458, 459-60 (noting that "smoking guns such as a sign on the door that 'Irish need not apply' are largely thing of the past). Under the framework of *McDonnell Douglas*

9

*Corp., v. Green*, 411 U.S. 792, 93 S. Ct. 1817, L.Ed.2d 668, Plaintiff has an initial burden of proving a *prima facie* case, which requires: (1) that she is within a protected age group, (2) that she met applicable job qualifications, (3) that despite these qualifications, she was discharged, and (4) that, after the discharge the position remained open and the employer continued to seek applications from younger persons with similar qualifications.  Once such a prima facie case has been made, the burden shifts to the employer to rebut plaintiff's showing. *Id.*  A rebuttable presumption of unlawful age discrimination is created. *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 807 (8th Cir. 2003).

In cases where a "Reduction in Force" was the claimed cause of dismissal, *Holley v. Sanyo Mfg.*, 771 F.2d 1161 (8th Cir. 1985) held that the requirement to show the employer continuing to seek applications from similarly skilled workers was inappropriate.  If discharge is the result of reduction in force, Plaintiff must meet the first three requirements and come forward with additional evidence that age was a factor in her termination. *Bashara v. Black Hills Corp.*, 26 F.3d 820 (8th Cir. 1994) (citing *Holley* at 1165).  The first three requirements in the Plaintiff's *prima facie* case are undisputed.  The Plaintiff was approximately 70 years of age at the time of termination.  The Defendant has not claimed the Plaintiff was not qualified for the position or unable to perform the duties of her position.  The Plaintiff had worked in the same position for the Defendant, irrespective of changes in ownership and management, for approximately nine years prior to termination.  Despite her years of service, and the fact that she was qualified enough in her position to be placed in charge of training new employees, the Plaintiff was discharged.  Because the Defendant has claimed that Plaintiff's discharge was part of a reduction in force, the Plaintiff must present evidence that age was a factor in her termination.

*Evidence of the Factor of Age*

In June of 2008, Chris Hallgren contacted representatives of Coventry Health Care to obtain a quote for premium costs for a group health insurance policy for Associated Underwriters employees. (Pl. Ex. P, AU-Coventry E-mails)  After back and forth discussion between the respective representatives, and in an attempt to obtain the best premium pricing, on July 28, 2008, Greg Gurbacki wrote to Coventry Health Care: "We have lost several of the older, sicker employees and should have some consideration on this.  If you have provided us with your final rates then that is what we will use in our decision."  (Pl. Ex. P, AU-Coventry E-mails) Defendant believed that by "losing" his "oldest and sickest" employees the group health insurance costs would be reduced. Defendant acted on that belief when he terminated the "oldest and sickest" employees, a protected group of which Plaintiff was a member.

In August of 2008, Chris Hallgren met with Marjorie Tramp, age 70, and Barb Treadway, age 71, and requested they voluntarily withdraw from coverage under the company's health insurance policy and apply for Medicare/Medicaid health insurance coverage.  Chris Hallgren was aware that both ladies would qualify for Medicare/Medicaid coverage due to their age. During this meeting, Chris Hallgren did *not* offer that Associated Underwriters would pay for the costs of supplemental coverage to their Medicare/Medicaid coverage if necessary.  Chris Hallgren gave the ladies one day to make their decision whether to stay on Associated Underwriters' health insurance policy (for which they were already enrolled) or to withdraw their enrollment and apply for Medicare/Medicaid coverage.  The next day, Marjorie Tramp informed Chris Hallgren that she would not withdraw from Associated Underwriters' health insurance policy.  Chris Hallgren expressed his "disappointment" with Marjorie Tramp's

11

decision, accusing her of being selfish in contributing to the increased cost of younger employee's health insurance-related costs. (Tramp depo. 19:5-21:20; 22:3-24; Complaint ¶6)

In June of 2009, after the termination of Marjorie Tramp and Barb Treadway, Associated Underwriters again contacted representatives of Coventry Health Care to attempt to obtain better premium pricing for the company health insurance coverage. Using very similar language to that used in the 2008 correspondence, Greg Gurbacki against believes the company is entitled to better pricing for reducing the old and sick employees from the coverage group.

> Since last year we have lost our oldest and sickest employees, Jim & Shari Devine are no longer here, Barb Treadway and Marjorie are no longer here. Please let me know if this is the best we can do, what choices we have with you as I know that Chris and Jeff Mann would like to stay with you but we were expecting a rate decrease from the group becoming younger and healthier not an increase. (Pl. Ex. P, UA-Coventry E-mails)

It bears pointing out the while Mr. Gurbacki uses the same "oldest and sickest employees" language, here, after the Plaintiff's termination, Mr. Gurbacki **specifically designates** the Plaintiff, Marjorie Tramp, as one of the "oldest and sickest employees".

In its brief in support of the motion for summary judgment, the Defendant argues that the language "We have lost our *oldest* and *sickest* employees" (emphasis added) is distinguishable from "we have terminated our oldest and sickest employees" and therefore it does not show discrimination. Employees are not socks in a dryer, they do not simply disappear. The Defendant's use of euphemisms does not obviate the stigma of discriminatory intent evident from this correspondence. Defendant's mistaken assumption that by firing his oldest and sickest employees would be a financial windfall for him does not obviate his discriminatory firings. The Defendant's own demands to lower his insurance costs are as close to direct evidence of discrimination as can be expected in this day and age. The Defendant's argument borders on the absurd, attempting to split hairs with euphemism and language choice to twist the clear meaning

12

and intent of the correspondence obvious upon a straightforward reading.   Simply stated, Defendant "lost" his "oldest" and "sickest" employees, and expected a financial windfall.  A trier of fact could certainly conclude from this evidence that the Defendant's expected windfall clearly illustrates that the motivating factor in the Plaintiff's termination was not poor performance, rather it was removing her from the group coverage as she was among the "oldest and sickest" employees.   A trier of fact could conclude that the Defendant terminated the Plaintiff's employment in order to reduce the Defendant's health insurance premium costs.

Further support for such a conclusion comes from the deposition testimony of the Defendant's bookkeeper, Julie Brudny.  Ms. Brudny testified the Defendant's monthly premium payments for health insurance coverage, prior to Hallgren and Gurbacki purchasing the company, were approximately $13,000 per month.   After Hallgren and Gurbacki purchased the Defendant, from November of 2008 through January 2009, the company monthly health insurance premium payments decreased to $9,000 per month.   She further testified that from February 2009 (the month Marjorie Tramp's employment was terminated) through July of 2009, the company's monthly health insurance premium payments decreased to $5,000 per month.  (Pl. Ex. B, Brudny depo. 36:17-37:19)

A trier of fact could find a clear causal connection between her refusal to drop the company health insurance, Marjorie Tramp's termination, and Defendant's subsequent demand to his insurance provider stating he deserved lower rates because he "lost his oldest and sickest employees".   Reviewing the evidence above, a trier of fact could certainly conclude that the Defendant engaged in a pattern of conduct to target older employees, such as the Plaintiff, to be removed from the group health insurance plan.   Consequently, the Plaintiff believes she has established her *prima facie* case.

13

**B.**     **Defendant's actions in attempting to justify Marjorie Tramp's termination are mere pretext for Defendant's unlawful discrimination**.

The Defendant has proposed several *ex post facto* reasons for Tramp's termination. The Defendant first claims it was necessary to engage in a reduction of force. The Defendant then claims the Plaintiff was discharged as part of the reduction in force due to her poor work performance relative to other employees in personal lines division. The Supreme Court in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000), emphasized the importance of giving the plaintiff in these types of cases the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

*Reduction in Force*

First, Plaintiff disputes that the termination in question was part of what Defendant prefers to call a "reduction in force". Said termination occurred in wave of firings, that much is undisputed, however Defendant has produced no evidence indicating a plan or strategy involving any "reduction in force". In his deposition testimony, Greg Gurbacki admitted that no plan for a reduction in force was discussed in the Defendant's corporate minutes. (Gurbacki depo. 103:12-15) Mr. Gurbacki also testified that he did not know on what date he concluded the necessity of the reduction in force that took place in February of 2009. (Gurbacki depo. 15:15-25) The lack of a detailed plan for the so called "reduction in force" or objective standards by which terminations were carried out is of concern, in that evidence has been produced that indicates a financial benefit from the terminations of older, less healthy employees. Plans for a reduction in force usually contain objective factors to determine who will be terminated, the basis for the

14

determination of which employees will be terminated, and financial information as to how the terminations will benefit the company. While the content of Defendant's "plans" might be lacking, as the Court in *Bashara v. Black Hills Corporation*, 26 F.3d 820 (8th Cir. 1994) notes, the content or lack thereof is ultimately immaterial to the ultimate question of age discrimination. But Plaintiff maintains it is certainly relevant in this case as probative evidence for the trier of fact to consider whether this was a true "reduction in force" or rather further pretext for Plaintiff's dismissal.

Defendant continues to rely heavily upon facts they claim to be undisputed, drawing certain conclusions therefrom, in addition to statements from the depositions of Mr. Grubacki and Mr. Hallgren regarding the financial status of Associated Underwriters. The Defendant points out the company was heavily in debt, and it was necessary to make payroll cuts. (Grubacki depo. 79:5-21, 105:1-5; Hallgren depo. 54: 8-12, 67:23-68:4) However, observing the activities of the company using common sense leads to a different conclusion.

Associated Underwriters purchased the Jones-Taylor Insurance Agency on December 17, 2007, for the purchase price of $507,500.00 with delivery of $307,500.00 at the time of closing and execution of a promissory note in the amount of $200,000. Additionally, the parties agreed to pay John P. Jones a consulting fee of $1,000.00 per month for a period of 24 consecutive months. (Pl. Ex. O, Stock Purchase Agreement) Common sense dictates that companies with cash flow issues and high debt ratios would not be attempting to grow and subsume additional agencies and costs.

After having purchased the Jones-Taylor Insurance Agency, including with it the retention of four new employees, the Defendant hired three more new employees before July of 2008. In May of 2008, Associated Underwriters hired an additional employee, Tara Horn, to

15

assist with duties in the Jones-Taylor office. Ms. Horn was hired as a personal lines customer service representative. She was not licensed at the time of her hiring but became licensed to sell insurance within 2 months of hiring. (Pl. Ex. B, Brudny depo. 21:19-22:24) Prior to being hired by Associated Underwriters, Ms. Horn's work experience consisted of employment as a bank teller and a cocktail waitress. (Pl. Ex. H, Horn Employee file) In this same month, Stacy Bell was hired after having recently moved to Council Bluffs, Iowa, from Anita, Iowa. (Pl. Ex. I, Bell Employee file) On June 2, 2008, Dan Grasso was hired by Associated Underwriters. He was initially hired as a liaison between the offices of Associated Underwriters and Jones-Taylor. At the time of his hiring he was not licensed to sell insurance but did obtain his license at a later date. (Pl. Ex. A, Grasso depo. 8:7-16; Pl. Ex. J, Grasso Employee file)

All of the employees hired by the Defendant in 2008 were younger than Marjorie Tramp. (Pl. Ex. A, Grasso depo. 33:20-23) (Pl. Ex. I, Bell Employee file)

Reviewing the evidence above, a trier of fact could certainly conclude that the Defendant was not in such dire financial straits as to require a reduction in force. Moreover, a trier of fact could reasonably conclude that the Defendant's reduction in force was merely a pretext ultimately remove the two oldest participants in the Defendant's group health insurance plan.

### *Plaintiff's Performance*

The Defendant argues the Plaintiff was terminated approximately six months after refusing to drop out of Defendant's health insurance policy and therefore there is no temporal connection between the two events. The Defendant carefully avoids discussing the fact that approximately a month and a half after Plaintiff's refusal to go on Medicare, the Defendant began to "build a paper trail" in an attempt to create cause for terminating Plaintiff. On October 9, 2008, Marjorie Tramp was given a written reprimand and placed on 90 days probationary

status.  (Pl. Ex. C, Tramp Employee file)  On January 28, 2009, Marjorie Tramp requested Dan Grasso take her off probationary status.  Because Marjorie Tramp had corrected her deficiencies, and having met Grasso's expectations during the probationary period, the next day, Grasso complied and removed her probationary status.  (Pl. Ex. A, Grasso depo. 51:1-52:14)  Five days later, On February 3, 2009, Marjorie Tramp was fired by the Defendant.  (Gurbacki depo. 77:17-22)

The intervening actions of Defendant bridge the temporal gap between Plaintiff's refusal to drop out of Defendant's health insurance and Defendant's termination of Marjorie Tramp. The Eighth Circuit Court of Appeals held in *Hudson v. Norris*, 227 F.3d 1047, 1051 (8th Cir. 2000), that the sufficiency of temporal proximity to establish a *prima facie* case varies "depending on the circumstances" of each case. In *Hudson*, the Arkansas Department of Corrections was charged with taking retaliatory actions against Hudson when he testified against them at trial. Hudson was, at the time, employed by the department of corrections. While the ultimate termination of Hudson did not occur until after 4 months after his protected action, testimony, a series of events occurred over those 4 months to indicate a causal connection to the protected action.

There is ample evidence for a trier of fact to conclude that the written reprimand and probationary status were pretextural events created to justify the Plaintiff's discharge on some other basis than her age and the related health insurance costs.  Greg Gurbacki directed Dan Grasso, who had been promoted to be Marjorie Tramp's supervisor, to prepare the written reprimand and place Marjorie Tramp on probationary status.  (Pl. Ex. A, Grasso depo. 26:24-27:17; 77:18-78:10)  Grasso would not have given Marjorie Tramp a written reprimand were it not for the direction of Greg Gurbacki.  (Pl. Ex. A, Grasso depo. 34:22-25)  Of the three

17

incidents listed in the written reprimand, the first outlined an incident that management was aware of in June of 2008. No action had been taken on the incident until it was included in the written reprimand in October of 2008. It should be pointed out the incident occurred before Dan Grasso was even employed by Associated Underwriters. (Pl. Ex. A, Grasso depo. 53:8-54:20)

From October of 2008 through February of 2009, Grasso did not prepare a written reprimand for any other employee of Associated Underwriters. For the same time period, Grasso did not give any verbal reprimands to any other employee of Associated Underwriters. (Pl. Ex. A, Grasso depo. 28:5-14)  In fact, a review of employee personnel files indicates that no employee received written reprimands because no employee performance reviews were conducted on *any* employee of Associated Underwriters after Hallgren and Gurbacki purchased the company. (Pl. Ex. B, Brudny depo. 47:14-24) (Gurbacki depo. 91:18-25; Pl, Ex. C-N)  After Marjorie Tramp was given the written reprimand and placed on probation, she was not provided with a work improvement plan or provided any information on what she needed to do to improve her work performance. (Gurbacki depo. 92:15-20)

From the time Hallgren and Gurbacki purchased Associated Underwriters in 2007 through October of 2010, no other employee of the Defendant was placed probationary status. (Gurbacki depo. 93:7-15)  Perhaps this is true because the policies of the Defendant did not include probationary status as a form of employee discipline.  Associated Underwriters enacted an updated employee handbook in April of 2008.  The employee handbook does not provide any notice to employees that placing an employee on probationary status is a possible form of discipline. (Pl. Ex. Q, Employee Handbook)

After 90 days of probation had passed, the Defendant failed to take any action on its own initiative to reconsider the status of the Plaintiff's employment.  On January 28, 2009, the

18

Plaintiff herself had to initiate the request that she be released from probationary status. Because the Plaintiff had corrected her deficiencies, and having met Grasso's expectations during the probationary period, the next day, Grasso complied and removed her probationary status. (Pl. Ex. A, Grasso depo. 51:1-52:14) On February 3, 2009, Marjorie Tramp and Barb Treadway's employment with Associated Underwriters was terminated. Associated Underwriters has maintained that the terminations were part of a reduction in force due to economic losses and Marjorie Tramp was discharged because she was the poorest performer in the personal lines division of the company. (Gurbacki depo. 77:17-22)

Hereto, there is ample evidence for a trier of fact to conclude that the Defendant's evaluation of the Plaintiff as the poorest performer is a mere pretext. As stated above, the Defendant did not conduct any employee performance reviews. The Defendant did not provide any employee performance reviews for the employees that were retained with the purchase of the Jones-Taylor Insurance Agency. There was no way the Defendant could have conducted a fair and accurate comparison between the performance of the Jones-Taylor employees, who ultimately took over the Plaintiff's job duties, with the performance of the Plaintiff.

Until January of 2009, Sandy Peer, Sue Stilmock, Kelsey Hetrick, and Tara Horn, only had experience dealing with clients of the Jones-Taylor Insurance Agency and the procedures for dealing with those clients. Until January of 2009, the Jones-Taylor employees were not involved in the day to day operations conducted at the office of Associated Underwriters. (Pl. Ex. A, Grasso depo. 73:10-74:8) Therefore, the Jones-Taylor employees only had approximately one month of comparable experience to the Plaintiff. More specifically, one of the Jones-Taylor employees, Kelsey Hetrick, assumed the duties of receptionist once she began working at the Associated Underwriters office and never obtained a license to sell insurance. (Pl. Ex. B,

19

Brudny depo. 20:21-21:4; Pl. Ex. G, Hetrick Employee file)  Without a license to sell insurance, Kelsey Hetrick wasn't qualified to perform the same job duties as the Plaintiff.  At the time Marjorie Tramp was fired, Tara Horn, another of the Jones-Taylor employees, was approximately 8 months removed from having been employed as a bank teller with no prior insurance experience.  (Pl. Ex. B, Brudny depo. 21:5-13; Pl. Ex. H, Horn Employee file)

A trier of fact could reasonably conclude that the Defendant's written reprimand, probationary status, and evaluation as a weak performer, was merely a pretext designed to ultimately remove one of the oldest participants in the Defendant's group health insurance plan. This series of events connects Plaintiff's refusal to drop out of the Defendant's health insurance plan, going on Medicare, and the Defendant's ultimate discharge of the Plaintiff. Prior to her refusal, Plaintiff had a clean employment record. After her refusal, she was given a written reprimand, with no goals, areas for improvement, or recognition of positive traits. Plaintiff was then placed on "probation", a process never before used in Associated Underwriters.  A trier of fact could certainly conclude that a review of the evidence supports the contention the Defendant did not fairly evaluate the Plaintiff's performance because there was no intention of continuing the Plaintiff's employment.

There exist many questions of material fact and a large amount of evidence a trier of fact could reasonably infer that Defendant's stated reasons for the discharge of the Plaintiff were, in fact, pretextural.  Consequently, the Defendant's Motion for Summary Judgment must be denied.

## C.   Plaintiff is entitled to recover for disability discrimination

To qualify for relief under the ADA, a plaintiff must establish the following: (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified; that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able

to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to an adverse decision, "because of" the plaintiff's disability. *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir. 2000).

### i.    Plaintiff suffers from a disability within the ADA

When the Defendant terminated Marjorie Tramp, it was aware she was scheduled for arthroscopic knee surgery. (Tramp depo. 30:6-33:5) The Defendant knew of this procedure and in light of its concern about insurance costs, sought to terminate prior to the surgery. This surgery for a recognized disability constitutes a protected act, within the ADA. As a result, by terminating Marjorie Tramp in a heartless attempt to reduce the costs of their health insurance premiums, Defendant's actions are in direct violation of the Americans with Disabilities Act. *The Americans with Disabilities Act* of 1990 (ADA), 42 U.S.C. §§ 12102(1)(A) (2012) states that a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual." Marjorie Tramps knee had been causing her pain and limiting her ability to perform her daily tasks and functions such as lifting, reaching, and other physical activities. These activities would have been even more limited during the period of her recovery. As a result, Marjorie Tramp is considered "disabled" under the Americans with Disabilities Act of 1990.

### ii.    Plaintiff was qualified for and able to perform the essential duties of her job, despite her disability.

In *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011 (8th Cir. 2000), the Eighth Circuit described the test for determining whether a person is qualified, for ADA purposes, to perform the essential functions of a job:

> The determination of qualification involves a two-fold inquiry: (1) whether the individual meets the necessary prerequisites for the job, such as education,

21

experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation. *See Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1111-12 (8th Cir. 1995). Although the employee at all times retains the burden of persuading the trier of fact that he or she has been the victim of illegal disability discrimination, "once the plaintiff makes 'a facial showing that reasonable accommodation is possible,' the burden of production shifts to the employer to show that it is unable to accommodate the employee.

*Id.* at 1112 (quoting *Mason v. Frank,* 32 F.3d 315, 318-19 (8th Cir. 1994)). *Cravens,* 214 F.3d at 1016; 42 U.S.C. § 12111(8).

Here, Plaintiff was scheduled to receive a "scope" on her knee to identify the nature of her pain approximately ***one day*** after she was terminated by Defendants for refusing to drop out of the company's health insurance plan. (Tramp depo. 30:6-33:5) Plaintiff would have required some recovery time to allow her knee to heal, and would have had a prohibition on lifting and some other activities, but otherwise would have remained perfectly qualified to maintain her position with minor accommodations, had Defendants not terminated her based on the added cost her disability and age gave the company's insurance costs. In fact, the Plaintiff had informed the Defendant she was planning on returning to work the Monday following the procedure. (Tramp depo. 30:6-33:5) These are all "major life activities" as defined by the Eighth Circuit in *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 946 (8th Cir. 1999) which considered major life activities to include sitting, standing, lifting, and reaching.

### iii.     Defendant Terminated Plaintiff due to her Disability

As stated above, the Defendant's quest to reduce health insurance costs by eliminating the "oldest and sickest" employees and their subsequent termination of Marjorie Tramp, after her refusal to leave their company health insurance, and just the day before her scheduled knee surgery, indicates the Defendant was aware of her disability and decided to avoid the costs associated with her disability by terminating her. There is an almost immediate temporal

22

connection between these two events, and a chain of events and harassment leading up to the Plaintiff's termination. These events, coupled with the Defendant's knowledge of the Plaintiff's impending disability and the pattern of harassment directed at Plaintiff after she refused to drop out of the company health insurance, provides sufficient facts that a trier of fact could find the Defendant discharged the Plaintiff based on her age and disability in an attempt to save money on the company health insurance coverage. The circumstances surrounding Marjorie Tramp's termination raises at least an inference of unlawful discrimination, as required by law. *See Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1206 (8th Cir. 1997) (citing *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 487 (8th Cir. 1996)); *Price v. S-B Power Tool,* 75 F.3d 362, 365 (8th Cir. 1996)). Consequently, based upon the existence of existence of a genuine issue of material fact, the Defendant's Motion for Summary Judgment as to the Plaintiff's ADA claim should be denied.

## CONCLUSION

For all the aforementioned reasons, the Plaintiff has illustrated a factual basis for a *prima facie* case of age discrimination based on her unlawful termination by the Defendant. It is undisputed the Plaintiff is a member of a protected class, being over forty years old at the time of her discharge. The Plaintiff was highly qualified for her position with Associated Underwriters, having never received any complaints about her work performance until after she had refused to decline to participate in the Defendant's company health insurance plan. The Defendant took action by terminating one of its "oldest and sickest employees", assuming it would reduce company health insurance premiums.

The reasons given for the Plaintiff's termination are at best suspect, at worst the flimsiest of pretext, having been carefully manufactured in preparation for her termination. There is more

23

than enough evidence for a trier of fact to conclude that the Plaintiff was discharged, unlawfully, due to her age and health, due to Defendant's attempt to save money on the company health insurance premium costs.

WHEREFORE, Plaintiff prays that Defendants Motion for Summary Judgment should be denied in its entirety.

DATED this 19th day of April, 2013.

MARJORIE TRAMP, Plaintiff

By:   /s/John P. Weis
John P. Weis #19618
Conor McCarthy, Senior Certified Law Clerk
SODORO, DALY & SODORO, P.C.
7000 Spring Street
Omaha, NE 68106
Telephone: (402) 397-6200
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of April, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Craig F. Martin
cmartin@ldmlaw.com
LAMSON, DUGAN and MURRAY, LLP
10306 Regency Parkway Drive
Omaha, NE 68114-3743
Attorneys for Defendant

And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participant:

None.

/s/John P. Weis
John P. Weis

24